IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KRISTEN ZINSELMEIER, Individually and on
behalf of WILLIAM ZINSELMEIER deceased,

             Plaintiff,

   v.

JEFFERSON COUNTY, MISSOURI,

Serve: Jefferson County Clerk
729 Maple Street
Hillsboro, MO 63050

VITALCORE HEALTH STRATEGIES, LLC.,

Serve:  Registered Agent CSC-Lawyers
Incorporating Service Company
221 Bolivar Street
Jefferson City, MO 65101

SHERIFF DAVID L. MARSHAK

Serve: Jefferson County Sheriff's Department
400 1st Street
Hillsboro, MO 63050,

CHELSEA GRIFFON [née Helwig],

Serve: Jefferson County Jail
510 1st Street
Hillsboro, MO 63050,

MEGAN JOHANSSON,

Serve:  Jefferson County Jail
510 1st Street
Hillsboro, MO 63050,

KEELY DAYTON,

Serve: Jefferson County Jail

JURY TRIAL DEMANDED

510 1st Street
Hillsboro, MO 63050,

ROLAND KIRCHOFF,

Serve: Jefferson County Jail
510 1st Street
Hillsboro, MO 63050,

BRANDON SHOULTS,

Serve: Jefferson County Jail
510 1st Street
Hillsboro, MO 63050,

BRENDA SHORT,

Serve: Jefferson County Jail
510 1st Street
Hillsboro, MO 63050,

DR. DANNY STANTON

Serve: Jefferson County Jail
510 1st Street
Hillsboro, MO 63050,

and

JOHN DOES 1-9.


                    Defendants.

## **COMPLAINT**

COMES NOW, Plaintiff, Kristen Zinselmeier, individually and on behalf of William

Zinselmeier, deceased, and for her Complaint against Defendants Jefferson County, Missouri,

VitalCore Health Strategies, LLC, Sheriff David Marshak, Chelsea Griffon (née Helwig), Megan

1

Johansson, Keely Dayton, Roland Kirchoff, Brandon Shoults, Breanda Short, John Does 1-9, and

Dr. Danny Stanton, who are sued in their individual capacities, states as follows:

**STATEMENT OF CASE**

1.      In January of 2023, Jefferson County Jail detainee William Zinselmeier, ("Mr.

Zinselmeier"), diagnosed with diabetes and high blood pressure and taking prescribed medication,

became too sick to get out of bed, eat, and ambulate. Mr. Zinselmeier was unable to walk out of

his cell to retrieve his prescription medications and he was punished for it by being deprived of

these medications. As the days passed, Mr. Zinselmeier's condition worsened and fellow detainees

became increasingly concerned about Zinselmeier, as he was unable to drink water or eat food

without immediately vomiting. Both Mr. Zinselmeier and other inmates requested medical help,

medication, and voiced their concerns for Mr. Zinselmeier's serious medical needs, including

warning guards and nurses, and repeatedly pressing the emergency call button. Zinselmeier said

several times "I feel like I'm gonna die". His roommate told guards he was "dying". Despite these

serious complaints, and requests for his prescription medication and treatment, Jefferson County

Jail correctional officers and VitalCore medical staff ignored the pleas. Zinselmeier also hadn't

eaten in more than four days. Ten hours before he died Zinselmeier fell out of bed and was

unresponsive. For ten hours Mr. Zinselmeier would lay unresponsive while guards milled in and

out, knowing Zinselmeier was unresponsive, but doing nothing. Mr. Zinselmeier's earlier sick call

and request for a nurse visit also went unheeded. Then, on January 6, 2023, after Zinselmeier fell

out of bed and was unresponsive, a jail guard or guards entered Zinselmeier's cell twice between

7:13 p.m. and 7:18 p.m., but despite knowing Zinselmeier was unresponsive, upon information

and belief, the guards  made no effort to contact medical, a supervisor, call 911 or take any action.

In the early hours of January 7, 2023, Mr. Zinselmeier died as the result of deliberate indifference

to his obvious and serious medical needs, including his well-known need for prescription medication, and ultimately his unresponsiveness.

Witness Lamar Dorsey said that on January 6, 2023, he heard the loud thump of Zinselmeier falling out of his bed. He assisted in picking Mr. Zinselmeier up and putting him in bed. Witness Dorsey described Zinselmeier as breathing, however unresponsive. Dorsey was aware Zinselmeier had not eaten in approximately five days and was not provided his daily prescription medication.

Witness David Leadbetter informed Jefferson County investigators that he had told jail nurses Zinselmeier had been unable to eat for the last five days, and that anytime Zinselmeier would drink water he would vomit it back up. Witness Leadbetter explained that Zinselmeier had been making "weird sounds" and breathing heavily. Witness Leadbetter told corrections staff and nurses several times to check on Zinselmeier's wellbeing, however no one did. Ledbetter also described Zinselmeier as not being able to walk to the pod door to get his medication and was unresponsive or unable to speak after 5:00 p.m. on January 6, 2023, a full eleven hours prior to his death.

Witness Hannon Cyrus said Zinselmeier informed him he was unable to breathe or feel his arms and legs; the next night, Zinselmeier went silent and could not talk. Witness Cyrus informed corrections staff of Zinselmeier's symptoms and was told in response *"if he [Zinselmeier] wants his medicine he can get up and come get his medicine."* Witness Cyrus stated he never observed any jail or medical staff check on Zinselmeier.

Witness Samuel Kottwitz told investigators that he informed a corrections officer that Zinselmeier was "fatally ill" and needed medical assistance. Kottwitz said Defendant jail guard Kirchoff entered the pod (containing individual cells) but nevertheless did not check on

3

Zinselmeier's health. Witness Kottwitz also said a correctional officer told Zinselmeier if "you want your meds, you need to get out of bed and get them,".

Witness Charles Birrittier said that on January 6, 2023, after being sick for a long time, Zinselmeier had fallen out of his bed and no jail or medical staff checked on him. Birrittier said during evening medication pass the day before Zinselmeier was found dead, jail and medical staff refused to give Zinselmeier his prescription medication.

William Zinselmeier would be found dead in his cell  the following morning at 58 years old, leaving behind his beloved daughter, Kristen and three young grandchildren [pictured below], as well as his family and friends who grieve their loss. Zinselmeier's autopsy concluded that Zinselmeier's cause of death was hypertensive cardiovascular disease and listed diabetes mellitus as a significant condition. Zinselmeier's death was foreseeable and preventable.

2.      Accordingly, Plaintiff, individually and on behalf of her father William Zinselmeier, seeks judgment against the above-named Defendants, in their individual capacities, for violations of Mr. Zinselmeier's Constitutional rights to receive adequate medical care under the Eighth and Fourteenth Amendments (Count I); failure to train, supervise, or discipline (Count II) cognizable pursuant to 42 U.S.C. 1983 ("*Monell*"); and Unconstitutional Policy, Custom or Practice cognizable pursuant to 42 U.S.C. 1983 (Count III) ("*Monell*"). Plaintiff also brings claims under Missouri state law, including claims for wrongful death (Count IV), and additional federal claims of violations of the Americans with Disabilities Act (Count V) and violations of the Rehabilitation Act (Count VI).



*Bill Zinselmeier, his daughter Kristen, and his three grandchildren*

## JURISDICTION AND VENUE

3.      Jurisdiction is proper to this Court, pursuant to 28 U.S.C. §§ 1331 and 1343, which provides this Court with original jurisdiction over cases and controversies raising federal questions and claims. Further, this Court has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367, including the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) and the Rehabilitation Act (29 U.S.C. § 794).

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in St. Louis County, Missouri.

## PARTIES

5.      Plaintiff Kristen Zinselmeier (hereinafter "Plaintiff Zinselmeier") is and was at all times relevant herein a citizen of the United States of America and was a resident of the State of Missouri. Further, Plaintiff Zinselmeier is the daughter of William Zinselmeier and therefore the appropriate party to bring action on his behalf.

6.      Defendant Jefferson County, Missouri (hereinafter "Jefferson County") is body politic, municipal corporation and/or political subdivision of the State of Missouri, organized and existing pursuant to the Missouri Constitution and State Law. Defendant Jefferson County operates with authority over the Jefferson Sheriff Department.

7.      Defendant VitalCore Health Strategies, LLC (hereinafter "VitalCore") was, and is, a corporation authorized to do business within the jurisdiction of Jefferson County, Missouri, which lies in the Eastern District of Missouri. VitalCore was duly organized, created, and exists under and by virtue of the laws of the State of Kansas, with its principal place of business located in the State of Kansas. Upon information and belief, VitalCore was the employer of Defendants Johansson, Griffon (née Helwig), Dayton, and John Does 3-6 all times relevant hereto.

6

8.      Defendant Jefferson County Sheriff Dave Marshak is and was the Sheriff of Jefferson County, Missouri (hereinafter "Defendant Marshak") and he is and was at all time relevant hereto a citizen of the United States and the Sheriff of Jefferson County, Missouri who, upon information and belief, was responsible for overseeing the jail. At all times relevant hereto, Defendant Marshak was acting under color of state law and authority of his position as Sheriff of Jefferson County, Missouri and with Jefferson County, Missouri. For purposes of Plaintiff's federal claims, Defendant Marshak is named in his individual capacity and was acting within the scope and course of employment for Jefferson County, Missouri and was a final policy decision maker for Jefferson County jail.

9.      Defendant Chelsea Griffon (née Helwig) (hereinafter "Defendant Griffon") is and was at all times relevant hereto a citizen of the United States and a registered nurse employed by VitalCore Health Strategies, LLC ("VitalCore") who worked within the jail. At all times relevant hereto, Defendant Griffon was acting under color of state law and authority of her position with Defendants VitalCore and Jefferson County. For purposes of Plaintiff's federal claims, Defendant Griffon is named in her individual capacity and was acting within the scope and course of employment for their employer(s) VitalCore..

10.     Defendant Megan Johansson (hereinafter "Defendant Johansson") is and was at all time relevant hereto a citizen of the United States and a licensed practical nurse employed by VitalCore Health Strategies, LLC who worked within the jail. At all times relevant hereto, Defendant Johansson was acting under color of state law and authority of her position as a nurse with Defendants VitalCore Health Strategies, LLC and Jefferson County. For purposes of Plaintiff's federal claims, Defendant Johansson is named in her individual capacity and was acting within the scope and course of employment for their employer(s)VitalCore..

7

11.     Defendant Keely Dayton (hereinafter "Defendant Dayton") is and was at all time relevant hereto a citizen of the United States and a nurse practitioner who, upon information and belief, is employed by Defendant VitalCore Health Strategies, LLC to work in the jail. Defendant Dayton had a provider-patient relationship with Mr. Zinselmeier and was responsible for overseeing his care. At all times relevant hereto, Defendant Dayton was acting under color of state law and authority of her position with Defendant Jefferson County. For purposes of Plaintiff's federal claims, Defendant Dayton is named in her individual capacity and was acting within the scope and course of employment for their employer(s) VitalCore, Jefferson County.

12.     Defendant Roland Kirchoff (hereinafter "Defendant Kirchoff") is and was at all times relevant hereto a citizen of the United States employed as a correctional guard by Jefferson County. In this role, Defendant Kirchoff was responsible for supervising Mr. Zinselmeier and alerting medical staff to Mr. Zinselmeier's condition. At all times relevant hereto, Defendant Kirchoff was acting under color of state law and authority of his position with Defendants Jefferson County. For purposes of Plaintiff's federal claims, Defendant Kirchoff is named in his individual capacity and was acting within the scope and course of employment for their employer(s) Jefferson County.

13.     Defendant Brandan Shoults (hereinafter "Defendant Shoults") is and was at all times relevant hereto a citizen of the United States employed a correctional guard by Jefferson County. In this role, Defendant Shoults was responsible for following jail policies and supervising Mr. Zinselmeier including ensuring he received prescription medication and alerting medical staff and his own supervisors to Mr. Zinselmeier's medical condition. At all times relevant hereto, Defendant Shoults was acting under color of state law and authority of his position with Defendants Jefferson County. For purposes of Plaintiff's federal claims, Defendant Shoults is

named in his individual capacity and was acting within the scope and course of employment for their employer(s) Jefferson County.

14.     Defendant Brenda Short (hereinafter "Defendant Short") is and was at all times relevant hereto a citizen of the United States employed as a jail administrator by Jefferson County. In this role, Defendant Short is and was responsible for hiring and training healthcare staff to work at the Jefferson County Jail, implementing healthcare standards of practice and processes, and meeting with healthcare and correctional staff on a regular basis. At all times relevant hereto, Defendant Short was acting under color of state law and authority of her position with Defendants Jefferson County and/or VitalCore. For purposes of Plaintiff's federal claims, Defendant Short is named in her individual capacity and was acting within the scope and course of employment for their employer(s).

15.     Defendant Dr. Danny Stanton is and was at all time relevant hereto a citizen of the United States employed by ACH as the supervising and treating physician at Pike County Jail. In this role, Defendant Stanton was responsible for all standing orders, training of medical staff, reviewing medical records, prescribing medication, treating acute and chronic illnesses, and otherwise providing care consistent with a patient-physician relationship, maintaining healthcare related protocols and procedures, and meeting with healthcare and correctional staff on a regular basis. At all times relevant hereto, Defendant Stanton was acting under color of state law and authority of her position with Defendants Jefferson County and/or VitalCore. For purposes of Plaintiff's federal claims, Defendant Stanton is named in his individual capacity and was acting within the scope and course of employment for their employer(s).

16.     Defendant Corina Halbach is and was at all time relevant hereto a citizen of the

9

United States employed by Jefferson County, Missouri to act as the deputy jail administrator and, at times, the interim jail administrator. At all times relevant hereto, Defendant Halbach was acting under color of state law and authority of her position with Defendants Jefferson County and/or VitalCore. For purposes of Plaintiff's federal claims, Defendant Halbach is named in his individual capacity and was acting within the scope and course of employment for their employer(s).

17.     Defendant John Does 1 and 2 ("John Doe Supervisors") is and was, at all times relevant hereto, citizens of the United States and agents or employees of the Jefferson County jail. At present, these individuals have yet to be identified by name but were, at all times relevant hereto, acting under color of state law and authority of their position(s) with Defendant Jefferson County. On information and belief, Defendant John and Jane Does 1-2 were responsible for the training, supervision and discipline  of jail personnel including Sheriff's department employees and VitalCore agents and employees at the Jefferson County jail. For purposes of Plaintiff's federal claims, Defendants Doe 1 and 2 are named in their individual capacities and were acting within the scope and course of employment for their employer(s).

18.     Defendant John Doe 3 and 4 ("John Doe Physicians") are and were, at all times relevant hereto, citizens of the United States and agents or employees of VitalCore Health Strategies as the jail physician and/or medical provider. At present, these individuals have yet to be identified by name but were, at all times relevant hereto, acting under color of state law and authority of their position(s) with Defendant VitalCore Health Strategies. Upon information and belief, Defendant John and Jane Doe 3 and 4 were jail doctors or outside doctors provided by VitalCore responsible for treating detainees and supervising subordinate nurses.. For purposes of Plaintiff's federal claims, Defendants Doe 3 and 4 are named in their individual capacities and

were acting within the scope and course of employment for their employer(s) VitalCore or Jefferson County.

19.     Defendant John Doe 5 and 6 ("John Doe VitalCore corporate officers") is and was, at all times relevant hereto, citizens of the United States and agents or employees of VitalCore Health Strategies or the Jefferson County Jail. At present, these individual has yet to be identified by but were, at all times relevant hereto, acting under color of state law and authority of their position(s) with Defendant VitalCore Health Strategies as Chief Medical Officers, regional or state managers and final corporate decision makers with responsibilities for supervision of the Jefferson County jail in Missouri. On information and belief, Defendant John Doe 5 and 6 were also responsible for training, supervision and discipline of doctors and nurses employed by or contracted by VitalCore. For purposes of Plaintiff's federal claims, Defendant Doe 5 and 6 are named in their individual capacities and were acting within the scope and course of employment for their employer(s) VitalCore.

20.     Defendant Jail Guards John Does 7-9 ("John Doe Jail Guards") are and were, at all times relevant hereto, citizens of the United States and jail guards and/or correction officers working as agents or employees of the Jefferson County jail. At present, these individuals have yet to be identified by name but were, at all times relevant hereto, acting under color of state law and authority of their position(s) with Defendant Jefferson County. For purposes of Plaintiff's federal claims, Defendant Does 7-9 are named in their individual capacities and were acting within the scope and course of employment for their employer Jefferson County.

## ALLEGATIONS COMMON TO ALL COUNTS

21.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if referenced herein.

11

22.　　At all times relevant, the individual Defendants acted within the course and scope of their employment with Jefferson County and/or VitalCore. Accordingly, Defendants Jefferson County, VitalCoe are vicariously liable for their wrongful acts and omissions under the doctrine of respondeat superior.

23.　　On March 18, 2022, William Zinselmeier ("Mr. Zinselmeier") was detained in the Jefferson County Jail and at all times detained, he was entitled to the protections of the United States Constitution, including the Eighth and Fourteenth Amendments.

24.　　At the time of his detention, Mr. Zinselmeier was 57 years old.

25.　　At the time of his detention, immediately upon intake, Mr. Zinselmeier informed jail staff that he suffered from diabetes and hypertension.

26.　　During his intake medical assessment, Mr. Zinselmeier informed jail staff that he was prescribed medications daily to manage his conditions, including metformin, Victoza (liraglutide), and amlodipine. Intake also documented his hypertension, recording a blood pressure of 153/101 on March 18, 2022.

27.　　Upon information and belief[1] Defendants Griffon, Johansson, Dayton, Kirchoff,

---

[1] When Plaintiff's allegations are made upon information and belief in this complaint, Plaintiff asserts that evidence supporting Plaintiff's allegations is within the sole possession and control of the defendant or where the belief is based on sufficient factual material (i.e. limited records produced pursuant to HIPAA and Sunshine requests) which makes the inferences plausible. This is particularly true as it relates to Plaintiff's *Monell* claims for failure to train, supervise or discipline and unconstitutional policy, custom or practice which facts (including notice and pattern) are often solely in the possession of Defendants. "[A]llegations pled on information and belief are not categorically insufficient to state a claim for relief where the proof supporting the allegation is within the sole possession and control of the defendant or where the belief is based on sufficient factual material that makes the inference of culpability plausible." *Ahern Rentals, Inc. v. EquipmentShare.com*, 59 F.4th 948, 954 (8th Cir. 2023). *Ahren* further asserts that prior to the parties being permitted to conduct discovery, at this stage of the proceedings, the Court may rely on a reasonable inference or belief that information needed for Plaintiff's claims are in the sole possession of the defendant(s). Id., at 954. *See also Tashonda Troupe v. Anthony Young, et al., No. 24-1036 (8th Cir. July 11, 2025).*

Short, and John Does 1-9 had actual knowledge that Mr. Zinselmeier had diabetes and hypertension which required close monitoring, daily prescription medication, and treatment.

28. Diabetes and hypertension are conditions that pose a substantial risk of serious harm and can be fatal if untreated or improperly treated, and both are recognized disabilities under the Americans with Disabilities Act.

29. Mr. Zinselmeier's diabetes and hypertension substantially limited one or more of his major life activities, including but not limited to eating, drinking, walking, caring for himself, normal circulatory function, and normal endocrine function. When untreated or improperly treated, his conditions left him unable to eat without vomiting, unable to ambulate to retrieve medications, unable to breathe normally, and ultimately bedridden.

30. Accordingly, Mr. Zinselmeier had several other prescriptions, including metformin requiring twice-daily medication administration by nurses, and amlodipine requiring once-daily medication administration by nurses, including the jail nurses, at the Jefferson County jail.

31. Upon information and belief, Zinselmier's prescription for Amlodipine and Metformin were not provided to him in the days leading up to his death.

32. In mid-December 2022, Mr. Zinselmeier became increasingly, noticeably and severely ill. He experienced symptoms including, but not limited to persistent nausea and vomiting, inability to eat and drink for 4+ days, weakness, inability to walk, inability to retrieve his medication, and ultimately exclaiming "I feel like I'm going to die."

33. On January 5, 2023, Zinselmeier wrote in a sick call request that he "ha[d] not eaten in 4 days."

34. Upon information and belief, Defendant Short read the sick call or grievance

13

request.

35.    Zinselmeier's symptoms were classic signs of serious medical need(s) particularly in an unmonitored diabetic and hypertensive patient.

36.    Upon information and belief, on or around the first week of January all individual defendants and John Does knew Mr. Zinselmeier exhibited the above symptoms.

37.    Defendants jail nurses Chelsea Griffon (née Helwig), Megan Johansson, Keely Dayton and John Doe Medical Providers 3-6 had actual knowledge Zinselmeier was a diabetic hypertensive patient.

38.    Defendants jail nurses Chelsea Griffon, Megan Johansson, Keely Dayton and John Doe Medical Providers 3-6 were aware of Zinselmeier's symptoms including ongoing nausea and prolonged vomiting of food and water from sick call notes sent by Mr. Zinselmeier, and internal discussions and despite that these defendants didn't order or ensure that Zinselmeier's vitals were taken or recorded, including blood pressure and blood glucose levels, and no defendant escalated care or ensured Zinselmeier received his medication despite obvious risk of cardiopulmonary decompensation due to his chronic and untreated serious medical need.

39.    In the first week of January 2023, Mr. Zinselmeier and several other detainees also informed Defendant Kirchoff, a guard at the jail, that Mr. Zinselmeier needed his hypertension and diabetes medications and wasn't receiving them.

40.    Defendant Kirchoff had actual knowledge of Zinselmeier's serious medical needs, in that detainees reported to Kirchoff daily for at least three days prior to Zinselmeier's death that Mr. Zinselmeier was too sick to get up to walk to the medication cart, and Defendant Kirkoff responded, "if he wants his meds, he can get up and come get it."

41.    Defendant Kirchoff, though aware of Zinselmeier's serious medical need

including his need for prescription medication and inability to ambulate to retrieve it, disregarded it.

42.     Defendant nurses Chelsea Griffon (née Helwig), Megan Johansson, Keely Dayton and Defendant guards Kirchoff and Shoults were all aware that Mr. Zinselmeier was unable to retrieve his prescribed medications, but continued to enforce an unconstitutional policy, custom or practice of recording of allowing it to be recorded that bedridden patients like Zinselmeier had "refused" their medication.

43.     Defendant Brenda Short was, as jail administrator, responsible for hiring, training, and supervising healthcare staff and contractors. In such a capacity, Defendant Short knew about the systemic official policy, custom or practice of recording or allowing to be recorded that bedridden and ill patients had "refused" their medication.

44.      Defendant Short was also aware that these "refusals" had been recorded without proper refusal forms, incident reports, progress notes, or other documentation.

45.     Upon information and belief, as jail administrator, Defendant Short also participated in regular meetings with medical staff where inmate health concerns, including Zinselmeier's, were discussed.

46.     As such, upon information and belief, Defendant Short had actual knowledge not only of Zinselmeier's serious medical needs but also of the jail and Vitalcore's systemic deficiencies and violations of national correctional medication distribution practices which violations Ms. Short allowed to persist resulting in deliberate indifference and the denial of care that led to Mr. Zinselmeier's suffering and death.

47.     Defendant John Doe 3-4 were jail physicians, upon information and belief acting

15

within the scope and course of employment for Defendants VitalCore were also aware of Zinselmeier's serious medical needs, his need for prescription medication, his medical disabilities, his history of extreme hypertension and diabetes, and his deteriorating medical condition the last few weeks of his life and despite this knowledge disregarded Zinselmeier and his serious medical needs.

48.     Defendant John Doe 5-6, the Supervising physicians or corporate officers for VitalCore were responsible for overseeing the medical care provided within the Jefferson County jail. In such a capacity, they were responsible for policies, protocols, procedures, and ensuring they adhered to standard national correctional medicine practices.

49.     Defendant John Doe 5-6 were aware of Zinselmeier's prescription for Victoza (liraglutide), but discontinued the medication without any medical basis for doing so.

50.     Additionally, upon information and belief, by reviewing charting for Mr. Zinselmeier's diabetic and hypertensive history, Defendant John Does 5 and 6 was aware of his high-risk medical status.

51.      Upon information and belief, Defendants John Doe 5-6 were also aware of Zinselmeier's serious medical needs, his need for prescription medication, his medical disabilities, his history of extreme hypertension and diabetes, and his deteriorating medical condition the last few weeks of his life and despite this knowledge disregarded Zinselmeier.

52.     Upon information and belief, during the period of Mr. Zinselmeier's detention and including the month of January 2023, Defendants Chelsea Griffon (née Helwig), Megan Johansson, Keely Dayton, Roland Kirchoff, Brandon Shoults, Breanda Short, and John Does 1-9 personally observed, interacted with, and/or was aware of Mr. Zinselmeier's serious medical needs

16

including his deteriorating health and physical condition his inability to walk to retrieve his medication, and his need for monitoring and need for immediate medical care, but disregarded it.

53.     Under information and belief, during this time, nurses and correctional officers Defendants Chelsea Griffon, Megan Johansson, Keely Dayton, Roland Kirchoff, Brandon Shoults, Breanda Short, and John Does 1-9, acting alone and in concert with one another, at the Jefferson County Jail, adhered to a policy, custom and practice of falsifying medical records to claim that patients "refused" medications even if the patient was unable to walk to the pod door and medication cart during medication pass–or was even unable to get out of bed, or even unable to move or speak.

54.     At the time, Defendants nurses Chelsea Griffon, Megan Johansson, Keely Dayton, and guards Roland Kirchoff, Brandon Shoults, did not go to inmates' cells or ensure prescribed medications were administered to patients when they were unable to walk because they were too sick or disabled by their sickness.

55.     During the medication passes on the evenings of January 5, 2023 and January 6, 2023, Mr. Zinselmeier, now bed bound, was either too sick or unable to walk to the medication cart to take his hypertension and diabetes medication.

56.     Multiple detainees also informed the practical nurse on duty, Defendant Johansson, that Mr. Zinselmeier was too sick to get his medication and at one point that he couldn't even communicate or respond  to others.

57.     Defendant Johansson, however, recorded Mr. Zinselmeier as having "refused" his medications on both occasions without talking to Mr. Zinselmeier or assessing his health.

58.     Defendant Johansson didn't go to Mr. Zinselmeier's cell to check on him, did not

ask a guard to bring him to the pod door, did not ask a guard to check on his health, and did not ask a guard to accompany her to the cell to check on her patient, bring him his medication, or take his vitals.

59.     Upon information and belief, from January 1, 2023 until Mr. Zinselmeier's death on January 7, 2023, multiple detainees voiced their concerns to all individual defendants, guards and nurses alike, about Mr. Zinselmeier's serious medical needs *several times each day*.

60.     Upon information and belief, Defendants nurses Chelsea Griffon, Megan Johansson, Keely Dayton, and guards Roland Kirchoff, Brandon Shoults and Does 1 and 2 were aware of Mr. Zinselmeier's serious medical needs as they either witnessed Zinselmeeyer's inability to walk, heard his complaints and requests for medication and/or were informed by other detainees.

61.     Defendant nurses Chelsea Griffon, Megan Johansson, Keely Dayton, and Defendant guards Roland Kirchoff, Brandon Shoults and Does 1 and 2 had actual knowledge of Mr. Zinselmeier's serious medical need for his prescribed medication yet disregarded  this need.

62.     Defendant nurses Chelsea Griffon, Megan Johansson, Keely Dayton, and Defendant guards Roland Kirchoff, Brandon Shoults and Does 1 and 2 were aware that Mr. Zinselmeier was too sick to walk to the medication cart and knew Mr. Zinselmeier wasn't getting his physician prescribed medication.

63.     Defendant nurses Chelsea Griffon, Megan Johansson, Keely Dayton, and Defendant guards Roland Kirchoff, Brandon Shoults and Does 1 and 2 all knew the substantial risks of serious harm of not providing Zinselmeier his medication and treating his medical conditions..

64.     During the morning of January 6, 2023, Mr. Zinselmeier complained directly to Defendant Griffon that he had not eaten in several days and was severely ill.

18

Case: 4:25-cv-01893   Doc. #: 1   Filed: 12/31/25   Page: 20 of 57 PageID #: 20

65.     Defendant Griffon was aware of Mr. Zinselmeier's illness and medical needs on January 6, 2023, but chose to take no action on the matter and instead to leave it to the next shift nurse. She also did not escalate his care, seek to treat his underlying medical condition, take his blood pressure, or check his blood sugar levels.

66.     On January 6, 2023, Mr. Zinselmeier, now worried for his life and telling people he felt like he was "dying," would also complain to correctional guard Brian Voyles about his medical condition.

67.     Guard Voyles contacted Defendant Griffon to inform her of Mr. Zinselmeier's complaint.

68.     Defendant Griffon told Guard Voyles that she would not check on Zinselmeier and that a different nurse [Defendant Johansson] would be in the housing pod that evening. Defendant Griffon took no additional action and made no efforts to see Zinselmeier or escalate the situation to a higher level of medical care despite this information.

69.     Upon information and belief, jail guard Voyles took no further action to escalate care after being told by the on-duty nurse, Defendant Griffon said she was not going to see or treat Mr. Zinselmeier.

### *Zinselmeier unresponsive*

70.     Then, on the evening of January 6, 2023, at approximately 8:30 p.m. Mr. Zinselmeier, now desperately ill and ignored by jail and medical staff, fell out of his bed making a loud thump heard by other detainees.

71.     Multiple detainees rushed in to help put Mr. Zinselmeier back into his bed and asked him if he was alright, but Zinselmeier was unresponsive and unable to respond to the detainees' questions and inquiries.

19

72.     After Mr. Zinselmeier was lifted back in bed, multiple detainees immediately told guards, including but not limited to Defendant Kirchoff, what had happened, that Zinselmeier was unresponsive and needed immediate assistance.

73.     Upon information and belief, Defendant Kirchoff didn't even check on Zinselmeier and/or never got a verbal response from Zinselmeier.

74.     Upon information and belief, upon being informed that Mr. Zinselmeier had fallen out of his bed and was now unresponsive, other corrections officer Defendants and John Doe guards failed to check on Zinselmeier, call 911, or ensure follow-up medical care was provided.

75.     Then, Defendant nurse Johansson and Defendant guard Shoults arrived at Zinselmeier's housing unit or pod with the medication cart about 9:45 p.m. on January 6, 2023, shortly after Zinselmeier fell out of bed and while he was unresponsive.

76.     Multiple detainees informed Defendants nurse Johansson and guard Shoults of Mr. Zinselmeier's dire medical condition, that he fell out of bed, couldn't walk and was also now unresponsive.

77.     Defendant Johansson, instead of attempting to observe, medically assess, provide prescription medication to, or merely check in on Mr. Zinselmeier, simply ignored the complaints of detainees and recorded that Zinselmeier "refused" his medication.

78.     Zinselmeier did not "refuse" his medication.

79.     Upon information and belief, Defendant Shoults, standing by Defendant nurse Johansson's side and hearing the same information about Zinselmeier's dire conduction, did nothing to escalate, provide, seek, or obtain care for Mr. Zinselmeier.

80.     Defendant guard Shoults, upon information and belief, knew Defendant

20

Johansson was ignoring Zinselmeier, did not observe Zinselmeier, and ignored the dire reporting of other detainees, and therefore, he knew he could not reasonably rely on Defendant nurse Johansson's medical judgment.

81.     Defendant nurse Johansson and Defendant guard Shoults also did not ensure that Zinselmeier or two witnesses signed the claimed medical "refusal" form, pursuant to Jefferson County jail and VitalCore written policies.

82.     Recording a medical "refusal" for a detainee that was too sick to walk to the medication cart was an unwritten official policy of Jefferson County jail and VitalCore.

83.     Alternatively, recording a medical "refusal" for a detainee that was too sick to walk to the medication cart was a custom or practice of Jefferson County and VitalCore.

84.     Indeed, Defendant nurse Johansson stated in an interview with Jefferson County investigators that it was the regular practice in the Jefferson County Jail for VitalCore medical providers to record a medical "refusal" if a sick detainee could not get out of bed, leave their cell, and walk to the medication cart.

85.     Upon information and belief, Jefferson County jail policy and the national correctional standards require a refusal of medication form to be signed by the patient and a witness, or by two witnesses.

86.     Upon information and belief, no refusal form was signed by Zinselmeier, nor did any witnesses witness or sign a refusal.

87.     By violating Jefferson County jail policies and national correctional standards, defendants demonstrated further deliberate indifference toward Zinselmeier and his serious medical needs. Defendant nurse Johansson and Defendant guard Shoults, despite their knowledge

of Zinselmeier's serious medical need, did nothing and made no attempts to provide Zinselmeier his medication, a medical assessment or escalate care.

88.     Zinselmeier, predictably, would die within hours.

89.     At approximately 3:40 a.m. on January 7, 2023, Mr. Zinselmeier's cellmate observed that Zinselmeier was not breathing and pressed the emergency call button to notify the correctional guard on duty.

90.     EMS arrived at the scene at approximately 3:46 a.m. on January 7, 2023.

91.     EMS found Zinselmeier in asystole, and Mr. Zinselmeier was pronounced deceased in his cell at 4:08 a.m. on January 7, 2023. Zinselmeier's body was left in his cell for the Medical Examiner to transport. Zinselmeier would never go to the hospital or be seen by a doctor.

92.     The autopsy prepared by the Office of Dr. Mary E. Case, Chief Medical Examiner, revealed that Mr. Zinselmeier's cause of death was hypertensive cardiovascular disease with diabetes mellitus as a significant contributing condition.

93.     Not one blood pressure reading or blood sugar reading was taken in the week prior to Zinselmeier's death.

94.     However, *months before* his death, Zinselmeier's blood pressure was taken and the results were cause for alarm and medical concern.

95.      In August 2022, Defendant Griffon and/or another member of the jail or medical staff recorded Zinselmeier's blood pressure at *180/90 mmHg and 185/80 mmHg.*

### Dr. Stanton

96.     Upon information and belief, jail or VitalCore physicians, including Dr. Stanton

would review these blood pressure readings and despite that, no medical provider including Dr. Stanton would ensure Zinselmeier received close blood pressure monitoring after the end of August 2022 through the week of his death on January 7, 2023.

97.    Upon information and belief, Defendant Dr. Danny Stanton had a physician-patient relationship with Mr. Zinselmeier from the time he was incarcerated through his death.

98.    Upon information and belief, it was Dr. Danny Stanton's obligation to ensure that blood pressure readings were recorded and blood pressure medications administered, despite seeing his records.

99.    Upon information and belief, Dr. Stanton failed to review the medical records of his patient, Mr. Zinselmeier.

100.    Upon information and belief, Dr. Stanton was responsible for, and failed to adequately supervise, all medical staff working at the jail.

101.    Dr. Stanton was aware of Mr. Zinselmeier's high blood pressure and diabetes due to the blood pressure logs emailed to him.

102.    Upon information and belief, Dr. Stanton failed to ensure Mr. Zinselmeier's prescribed medications were administered.

103.    Upon information and belief, Dr. Stanton continued two of the three medications prescribed to Mr. Zinselmeier prior to his incarceration, discontinued Victoza, and failed to ensure and supervise the prescribed Amlodipine, Lisinopril and Metformin medication was administered.

104.    Upon information and belief, Dr. Stanton discontinued or failed to continue and supervise Mr. Zinselmeier's blood sugar and blood pressure monitoring.

105.    Upon information and belief, Defendant Dr. Stanton, nurses and medical

23

providers would never control Zinselmeier's blood pressure at a safe and stable level and would not closely monitor him, his vital signs, or blood sugar in the months prior to his death.

106.    Upon information and belief, Defendant Dr. Stanton was aware of the obviousness of ensuring his patients, including Zinselmier, received their prescription medication despite their inability to ambulate, leave their cell, or walk to the medicine cart yet, despite this, Dr. Stanton did not ensure that adequate policies, training or supervision was provided to ensure his patients received their medication and adequate medical care.

107.    Mr. Zinselmeier's suffering and death was preventable, including by providing appropriate close medical monitoring, medication and/or medical care and treatment for his diabetes, hypertension and ultimately his critical illness.

### *Witness Statements to Jefferson County Sheriff's Department Investigators*

108.    Fellow detainee and witness  Herbert Harris told Jefferson County investigators that Zinselmeier had been sick for approximately five days and hasn't left his room except to shower once. Mr. Harris said Zinselmeier had not eaten or gotten  his medications in several days and would vomit anytime he ate.

109.    Harris said Zinselmeier fell out of bed on Friday night January 6, 2023 and was flailing around. Harris said he along with inmate Lamar Dorsey helped Zinselmeier back into his bed. Harris reported  a corrections officer was summoned to check on Zinselmeier but medical staff did not come. Harris stated he later checked on Zinselmeier and he was moving around *but not talking.*

*110.*    Upon information and belief, after falling out of bed, Mr. Zinselmeier sustained a large gash to his forehead that went untreated by jail staff or medical personnel.

111.    Fellow detainee and witness Daniel Davis said he knew Zinselmeier hadn't eaten

in several days nor taken his medications because he couldn't get up.

112.    Fellow detainee and witness Adolpho Reyes said Zinselmeier was "really sick and

threw up a lot." Reyes said Zinselmeier was not provided his medications because he could not get

out of his bed. Reyes stated he knew Zinselmeier complained about being sick two days prior but

he did not believe anyone provided medical treatment. Reyes said Friday night (January 6, 2023),

Zinselmeier made the comment "I feel like I'm gonna die", multiple times. Reyes said

Zinselmeier's bunk mate was present during the time Zinselmeier made the comment.

113.    Upon information and belief, Zinselmeier's bunkmate Leadbetter, told

correctional officers repeatedly that Zinselmeier thought he was dying.

114.    Witness Lamar Dorsey said that on January 6, 2023, he heard Zinselmeier falling

out of bed and ran to the cell to observe him on the floor and he assisted in picking him up and

putting him in bed. his bunk. Dorsey described Zinselmeier as breathing, however was not talking

or responsive. Dorsey advised he was aware that Zinselmeier had not eaten in approximately five

days and was not taking his daily medication. He clarified that Zinselmeier did not refuse his

medication, however was not provided with them by jail staff. He stated that Zinselmeier had been

sick for approximately one week.

115.    Witness David Leadbetter said he had roomed within the same cell as Zinselmeier

since November 2022. He was aware that Zinselmeier had the medical issue of high blood

pressure. Leadbetter informed Jefferson County investigators that he had disclosed to jail nurses

that Zinselmeier had been unable to eat for the last five days and that anytime Zinselmeier would

drink water he would immediately vomit it back up into the cup. Leadbetter explained that

Zinselmeier had been making "weird sounds" and had been breathing heavily, as well as

complaining of body aches and being cold. Leadbetter stated he told corrections staff and nurses several times to check on Zinselmeier's wellbeing, however no one did.

116.    Leadbetter said he last informed the nurse on the morning of January 6th to check on Zinselmeier but he had not been checked on. He also described Zinselmeier as not being able to walk to the cell door to obtain his medication and that he stopped speaking at approximately 1700 hours on January 6, 2022. Then, he observed what he believed to be blood coming from Zinselmeier's mouth and notified corrections staff of his observations.

117.    Witness Hannon Cyrus said he last checked on Zinselmier the prior night but Zinselmeier did not speak last actually spoke to Zinselmeier during the afternoon of January 6th. During that time Zinselmeier informed Cyrus he was unable to breathe. Zinselmeier also informed him he was unable to feel his arms and legs and he described Zinselmeier as moaning. Cyrus informed corrections staff and was told by corrections staff, *"if he (Zinselmeier) wants his medicine he can get up and come get his medicine"*. Cyrus stated he never observed any jail or medical staff check on Zinselmeier[2].

118.    Samuel Kottwitz told investigators that he knew Zinselmeier had been sick and that detainees were checking on Zinselmeier periodically after he fell out of bed. He said around 2100-2200 hours on January 6, 2023, a detainee was trying to get a corrections officer [John Doe 7, 8, or 9] to check on Zinselmeier because he was "fatally ill". Kottwitz said Defendant Kirchoff entered the pod but nevertheless did not check on Zinselmeier. Witness Kottwitz said around 2215 hours officers were passing medication in the pod but Zinselmeier couldn't get out of bed to retrieve his medication. Witness Kottwitz said a correctional officer, believed to be Defendant

---

[2] Upon information and belief, it was Defendant Roland Kirchoff that said to Cyrus *"if he (Zinselmeier) wants his medicine he can get up and come get his medicine"*

Kirchoff, told Zinselmeier if "you want your meds, you need to get out of bed and get them" or something to that effect. Kottwitz remembers he was in his bed when he heard someone "freaking out" and saying "he's gone, he's gone" referring to Zinselmeier.

119.    Witness Charles Birrittier said that around 8:00-9:00 p.m. on January 6, 2023, Zinselmeier had fallen out of his bed and he didn't see any jail or medical staff come check on him. Birrittier said during medication pass that evening, around 9:30 p.m. he overheard that Zinselmeier couldn't get out of bed and neither jail or medical staff brought his medicine.

120.    In summary, all of the above witness statements to Jefferson County investigators reveal not only Zinselmeier's serious medical needs readily observable by laypersons, beyond the well-established Eighth Circuit standard for providing prescribed medication, but these witnesses also corroborate the willful and punitive nature of the deliberate indifference to Zinselmeier's serious medical need.

### *Defendants' Statements to Investigators*

*121.*    Defendant guard Shoults also told investigators he knew Zinselmeier was on the list to see the Nurse Practitioner, believed to be Defendant Keely Dayton, on Friday January 6, 2023.

*122.*    Upon information and belief, and corroborated by Defendant Shoults, Defendant nurse practitioner Keely Dayton disregarded her scheduled visit with Zniselmeier, knowing of Zinselmeier's serious medical need and demonstrating her deliberate indifference to Zinselmeier.

123.    Defendant Johansson told investigators she was aware that Zinselmeier requested to be seen by medical personnel after being sick for days but she did not see him after that request, but instead created a task for the next shift's nurse, Defendant Griffon. Johansson didn't know if Griffon saw him either.

124.    Zinselmeier did not have a history or reputation for refusing medication.

125.    For her part, Defendant Griffon admitted to investigators that Zinselmeier didn't have a history of refusing medication.

126.    Defendant Johansson also told investigators she did not give Zinselmeier his prescribed medication on the evening of January 6, 2023, the night he died.

127.    Defendant Johansson also stated that she personally saw Zinselmeier two days before on January 4, 2023 and he looked "sickly".

128.    On January 5, 2023, the *day after* Defendant Johansson claimed an encounter between herself and Zinselmeier, Zinselmeier submitted a written grievance saying he was nauseous and hadn't eaten for "4 days" or since January 1, 2023.

129.    Therefore, if Defendant Johansson indeed encountered or talked to Zinselmeier on January 4, 2023, Zinselmeier had been desperately ill and hadn't eaten in the three days before this encounter and, upon information and belief, Zinselmeier told Defendant Johansson.

130.    Both Defendant Johansson and Griffon had actual knowledge of Zinselmeier's written and oral grievances, and his serious medical need and upon information and belief, this information was passed down to other guards, up to medical providers and Defendant Jefferson County and VitalCore supervisors and was widely known in and out of the facility.

131.    Despite that, no individual defendant took any action to escalate, call 911 or merely send Zinselmeier to a doctor for assessment. Indeed, no one even took his vitals, including his blood sugar or blood pressure, despite his known condition.

132.    Certainly, Defendant Johannsson, Dayton and Griffon didn't take or record Zinselmeier's basic vital signs despite knowing he was chronically hypertensive, sick, diabetic, vomiting, unable to walk and bedridden.

133.   Brian Voyles was working the "bubble" on January 6, 2023. He states Zinselmeier used the intercom and asked to see the nurse for medical care.

134.   After receiving the grievance, Zinselmeier was placed on the nurse "sick call list" but, upon information and belief, Defendants Johansson nor Griffon, nor any Defendant nurse, visited with Zinselmeier or conducted a medical assessment.

135.   Jefferson County investigators determined that Zinselmeier did not receive his prescribed medication during the evening of December 31, 2022, the morning of January 4, 2023, the evening of January 5, 2023 and the evening of January 6, 2023.

### *Surveillance Video*

136.   Jefferson County investigators also reviewed jail surveillance audio and video taken on January 6, 2023 and January 7, 2023.

137.   Surveillance video shows no nurse is observed entering Zinselmeier's cell that entire evening or any other time.

138.   Surveillance video shows at 1911 on January 6, 2023, a detainee, believed to be Leadbetter, is observed exiting Zinselmeier's cell and pointing back inside the cell toward Zinselmeier. Upon information and belief, this video shows the moment Zinselmeier fell out of bed and was unresponsive. Another detainee is seen rushing toward the cell. A fourth detainee comes to the cell to look inside and immediately walks to the "call box" intercom system to notify correctional officers, believed to be John Does 7-9.

139.   As witnesses testified, after Zinselmeier fell out of bed he was unresponsive.

140.   Zinselmeier was now hours from death.

### *John Doe Guard's actual knowledge that Zinselmeier is unconscious or unresponsive*

141.   Surveillance video shows after Zinselmeier's fall, around 1913 hours on

29

January 6, 2023, a correctional officer believed to be John Doe 7, 8 or 9 enters Zinselmeier's cell and *leaves two minutes later* at 1915 hours, chats with detainees in the adjacent cell and then leaves the pod entirely, before returning to Zinselmeier's cell in the pod at 1916 hours and ultimately leaving at 1918 hours, completely disregarding and ignoring a now unconscious or unresponsive Zinselmeier after he fell out of bed. Upon information and belief, correctional officer John Doe 7, 8 and/or 9 had actual knowledge that Zinselmeier was unresponsive and in significant medical distress.

142.    Upon information and belief, correctional officer John Doe 7, 8 and/or 9 had actual knowledge that Zinselmeier was not being provided his prescription medication for days, had fallen out of bed, was unconscious and/or unresponsive and in significant medical distress.

143.    John Doe guards would be the last defendant and last jail or medical staff member to see Zinselmeier *alive*.

144.    Upon information and belief, all individual defendants had discussed amongst themselves, during pass down and shift change, Zinselmeier's deteriorating medical condition and serious medical need, including his inability to walk to the medical cart to get his medication, but despite their knowledge no defendant did anything to address his serious medical needs.

145.    All defendants, including doctors, nurses and guards intentionally, willfully, maliciously, and while acting under the color of state law demonstrated an extreme individual and systemic deliberate indifference to Mr. Zinselmeier's serious medical needs.

146.    Defendants Jefferson County and VitalCore employed policies, procedures, customs, practices and training promulgated by them that was the moving force behind the lack of adequate medical care for Zinselmeier, including the failure to deliver medicine, medical assessments, close observation, and escalation of medical emergencies thus violating

30

Zinselmeier's civil rights, and among other things, these Defendants also had a policy and pervasive practice of not administering prescribed medications to detainees who were too sick to walk to the medication cart and a policy of not assessing such ill patients or escalating medical care.

147.    Defendants Jefferson County, Jefferson County Sheriff and VitalCore enacted inadequate policies and did not train, supervise or discipline its agents or employees to ensure either existing policies were followed or ensure that Zinselmeier received his prescribed medications and medical attention.

148.    All defendants acted individually and in concert to deprive Mr. Zinselmeier of appropriate medical care, to which he is entitled to relief under the Eighth and Fourteenth Amendments to the Constitution and 42 U.S.C. § 1983.

149.    As a direct and proximate cause of Defendants' negligence and deliberate indifference, as stated herein. Mr. Zinselmeier experienced prolonged and intense pain and suffering and Plaintiff Kristen Zinselmeier and her family suffered the loss of her beloved father and grandfather.

150.    As a direct and proximate result of the actions of all Defendants described above and also pursuant to § 537.090 RSMo., Plaintiff has damages as follows: damages and pain and suffering that decedent Mr. Zinselmeier suffered leading up to his death, and for the recovery of which the decedent might have maintained an action had death not ensued; pecuniary loss suffered by reason of the death of Mr. Zinselmeier; funeral expenses; and a reasonable value of the companionship, comfort, instruction, guidance, support, and familial love of which the Plaintiff has been deprived by reason of the death of Mr. Zinselmeier.

151.    All of the aforementioned actions demonstrate that all Defendants' actions were

malicious, reckless and/or callously indifferent to Mr. Zinselmeier's rights so as to justify consideration by the trier of fact of aggravating circumstances in determining the amount of damages and punitive damages to be allowed.

152.    Plaintiff is entitled to compensation for violations of Mr. Zinselmeier's constitutional rights that all Defendants inflicted upon him, including, but not limited to, all damages allowable under § 1983 and § 1988; and for wrongful death pursuant to § 537.080 RSMo; pain and suffering of Zinselmeier before death; and for violations of the Americans with Disabilities Act and the Rehabilitation Act; attorney's fees under § 1988; and punitive damages.

### *Monell, Jefferson County contract, policies, and national correctional standards*

153.    Defendant jail guard Shoults told investigators that he remembered accompanying nursing staff earlier in the shift to distribute medications. Shoults said the "policy" is that medical staff distribute medications at the pod door and if an inmate does not walk to the pod door to retrieve his/her medications, they don't get their prescription medication.

154.    Defendant guard Shoults also told investigators he knew Zimselmier was scheduled to receive medication and was informed Zinselmeier was sick and wasn't feeling good enough to get up.

155.    Defendant Officer Shoults then informed investigators that the practice of the jail and medical staff is if a detainee is sick and doesn't "get up" and get their medication, that is logged as a "refusal".

156.    Defendant Shoults indicated the nurse on that medication pass, believed to be Defendant Johansson, said they [Johansson and Shoults] didn't need to do anything for Zinselmeier.

157.    Defendant Shoult's statements and actions, alone and in concert with Defendant

nurse Johansson, reflect the official written and/or official unwritten policy, custom or practice of Defendants Jefferson County, VitalCore. [*See Plaintiff's Monell claims Count II and III, infra*].

158.    Defendant practical nurse Johansson's statements to investigators corroborated Defendant Shoults statements, as she also told investigators that the policy, custom or practice of Defendant VitalCore's medical providers is to record a "refusal" if the detainee cannot or does not walk from his cell to the pod door for his prescription medication.

159.    This municipal policy, custom or practice of Defendants Jefferson County and VitalCore was undertaken in violation of not only the constitutional rights for detainees to receive their prescription medication which also led to detainees like Zinselmeier being cruelly punished for merely being sick, a violation of the United States constitutional right to adequate medical care in *Estelle v. Gamble*, 429 U.S. 97 (1976) and the right to prescription medication specifically established in the Eighth Circuit in *Dadd v. Anoka County*, 827 F.3d 749 (8th Cir. 2016).

160.    Defendant Jefferson County and VitalCore's unconstitutional policies, customs, practices and training, including the actions directed to Zinselmeier by the individual defendants were adopted and ratified by both Defendants Jefferson County and VitalCore through their final policy makers, the Sheriff and corporate officers from VitalCore, respectively.

161.    To the extent these unconstitutional written or unwritten policies, customs, practices or training are Defendant VitalCores's, Defendant guard Shoults statements confirm these policies or customs were adopted and ratified by Defendant Jefferson County or the Jefferson County Sheriff Marshak, as the Sheriff's obligation is to train and enforce such written or unwritten policies, customs, or practices within the jail.

162.    Jefferson County Jail policy J-005 states "When staff observes or is informed of a

33

detainee experiencing a medical emergency, they must *immediately notify medical staff, the shift supervisor, and summon emergency medical services (EMS/ambulance) if necessary."*

*163.*    Jefferson County Jail Policy J-023 states, in part *"Inmates will be seen in a timely manner by medical staff and be given a professional clinical judgment **and receive care that is ordered**.*"[prescribed medication, testing and treatment]*.

*164.*    Both of these written policies were violated in the case of Zinselmeier and replaced by an official unwritten policy of Jefferson County jail and VitalCore as described by Defendant Shoults and Johansson, that of recording a patient "refusal" if they are unable to walk to the medication cart or are unresponsive.

165.    At all times relevant, Defendant VitalCore was specifically contracted by Jefferson County to provide medical services consistent with and "based on standards through the American Correction Association ("ACA") and the National Commission on Correctional Health Care ("NCCHC").

### *Victoza (liraglutide)*

166.    Prior to the time he was incarcerated on March 18, 2023, Mr. Zinselmeier had been prescribed, inter alia, Metformin and Victoza (liraglutide) injections along with Amlodipine for his hypertension.

167.    During or immediately after intake, one of Mr. Zinselmeier's existing prescriptions for Victoza injections to manage diabetes and lower the risk of cardiovascular events and death was abruptly discontinued.

168.    Upon information and belief, the discontinuation of Victoza (liraglutide) injections was not made for any medical reason or purpose, but instead was simply discontinued for other reasons, including cost.

169.    Victoza (liraglutide) is an incretin mimetic with well-documented and well-established benefits for diabetes patients, including providing better control of high blood sugar and improving glucose management, and also reducing the risk of major cardiovascular events such as of heart attack, stroke, or death in adults with type 2 diabetes and known heart disease, and increased cardiovascular risks than many traditional glucose control techniques and medications.[3] Viztoza also *directly* reduces the risk of severe cardiovascular events[4] and lowers systolic blood pressure.[5]

170.    Upon information and belief, by discontinuing Mr. Zinselmeier's Victoza (liraglutide) injections upon intake, Defendants Stanton and John Does 3-6, Medication providers, and corporate officials of VitalCore knowingly deprived Zinselmeier of a prescribed medication to manage his diabetes, hypertension, and reduce the risk of adverse cardiovascular events.

171.    In doing so, these Defendants increased the risk of cardiovascular complications due to diabetes and hypertension, leaving Zinselmeier at elevated risk of serious complications due to life-threatening complications related to diabetes, high blood sugar (hyperglycemia), and/or high blood pressure (hypertension).

172.    Upon information and belief, other jails and prisons, including the Federal Bureau

---

[3] American Diabetes Association Consumer Guide: Victoza (liraglutide) https://consumerguide.diabetes.org/products/liraglutide#:~:text=Victoza%20(liraglutide)%20injection%20is%20a,absorption%20of%20mealtime%20blood%20glucose.
[4] Buse, John B et al. "Cardiovascular Risk Reduction With Liraglutide: An Exploratory Mediation Analysis of the LEADER Trial." *Diabetes care* vol. 43,7 (2020): 1546-1552. doi:10.2337/dc19-2251 https://pmc.ncbi.nlm.nih.gov/articles/PMC7305014/pdf/dc192251.pdf
[5] Zhao X, Huang K, Zheng M, Duan J. Effect of liraglutide on blood pressure: a meta-analysis of liraglutide randomized controlled trials. BMC Endocr Disord. 2019 Jan 7;19(1):4. doi: 10.1186/s12902-018-0332-5. PMID: 30616638; PMCID: PMC6323665. https://pmc.ncbi.nlm.nih.gov/articles/PMC6323665/

of Prisons, provide Victoza (liraglutide) for detainees with, inter alia, type 2 diabetes and cardiovascular disease.[6]

173.    Upon information and belief, the discontinuation of Victoza was a final decision made by John Does 5 and 6, final policy makers of Defendant VitalCore and/or Jefferson County.

## COUNT I
### Failure to Provide Adequate Medical Care in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution, Cognizable Under 42 U.S.C. § 1983
### *Against Defendants Kirchoff, Dayton, Griffon, Johansson, Short, Dr. Stanton and Does 1-9*

174.    Plaintiff hereby incorporates by reference the allegations made in each preceding paragraph as if each were set forth herein.

175.    Mr. Zinselmeier had multiple serious medical conditions which were recognized by Jefferson County and VitalCore staff members.

176.    As stated with specifically in the common allegation, Defendants ***Kirchoff, Dayton, Griffon, Johansson, Short, Dr. Stanton, and Does 1-9*** were aware of Mr. Zinselmeier's chronic health conditions, his need for medication and his serious medical needs during January 2023.

177.    Mr. Zinselmeier was experiencing objectively serious medical symptoms from the beginning of January 2023 until his death in the early hours of January 7, 2023.

178.    The above named Defendants were aware of the seriousness and escalating nature of Mr. Zinselmeier's condition, and deliberately disregarded them, as demonstrated, *inter alia*, including but not limited to Mr. Zinselmeier's complaints, his inability to get out of bed, his need for prescription medication and his unresponsiveness.

---

[6] National Formulary - Bureau of Prisons, published  May 2, 2022
https://www.bop.gov/resources/pdfs/2022_winter_formulary_part_1.pdf

36

179.    Further, as specifically described in Plaintiff's common allegations, laypersons were aware of the seriousness of Mr. Zinselmeier's condition, as indicated by several inmates' repeated attempts to get correctional guards and nurses to check on Mr. Zinselmeier during the first week of January 2023.

180.    Several fellow detainees heard guards and medical staff state that if Mr. Zinselmeier wanted his medication, he would "have to get up" to receive them.

181.    At no point in January 2023 did Mr. Zinselmeier received adequate care for his rapidly deteriorating condition.

182.    All above named Defendants acted with deliberate indifference to Mr. Zinselmeier's serious medical needs in that Defendants ignored complaints, doctor's orders, and Zinselmier's inability to get out of bed and later unresponsiveness.

183.    Defendants' denial of appropriate care demonstrates deliberate indifference towards Mr. Zinselmeier's condition in violation of Mr. Zinselmeier's Eighth Amendment and Fourteenth Amendment rights secured by the United States Constitution, cognizable under 42 U.S.C. § 1983.

184.    Defendants knew Mr. Zinselmeier was at substantial risk of serious injury to his health—including the possibility of death— due to his medical conditions, his illness, and his ability to take his medications throughout early January, and his unresponsiveness but disregarded that risk by intentionally refusing and/or failing to take any reasonable measures to treat his conditions and/or address his medical needs.

185.    Defendants were on notice that denying Mr. Zinselmeier appropriate medical care was to deny him of his U.S. Constitutional rights.

186.    In committing the acts alleged herein, Defendants acted willfully, recklessly,

maliciously, and with deliberate indifference to Mr. Zinselmeier and his serious medical needs and need for medical care.

187.    Defendants were acting under color of State law when they denied Mr. Zinselmeier his Constitutional right to adequate medical care.

188.    As a direct and proximate result of the acts and omissions of Defendants, while acting alone and/or in concert with others and with deliberate indifference towards Mr. Zinselmeier's rights and serious medical needs, Mr. Zinselmeier suffered severe and devastating damages and injuries, including but not limited to intense physical pain, the inability to get requested relief, his prescription medication and the subsequent suffering, cardiac complications, mental anguish, and ultimately death.

189.    The conduct of Defendants, as alleged herein, was wanton, willful, undertaken with evil motives, and/or displayed a deliberate indifference and callousness to Mr. Zinselmeier's constitutional rights, privileges and immunities, thereby justifying award of punitive damages against each individual Defendant, in his or her individual capacity, in an amount sufficient to punish and deter Defendants and others from engaging in like misconduct in the future.

190.    As a result of Defendants' unlawful actions and infringements of her protected rights, Plaintiff has been compelled to retain counsel in this matter and is therefore entitled to a recovery of attorney's fees and legal costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff Kristen Zinselmeier respectfully prays that this Honorable Court enter judgment in her favor and against Defendants Kirchoff, Dayton, Griffon, Johansson, Short, Dr. Stanton, and Does 1-9 jointly and severally; award her compensatory and punitive damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

**COUNT II**
**Failure to Train, Supervise, or Discipline, ("Monell/Canton Liability") in violation of the**
**Fourteenth Amendment to the U.S. Constitution, Cognizable Under 42 U.S.C. § 1983**
*Against Defendants Jefferson County, VitalCore, Marshak, Short, John Doe Supervisors 1-6,*
*and Dr. Stanton*

191.     Plaintiff hereby incorporates by reference all the allegations made in each

preceding paragraph as if each were set forth herein.

### *JEFFERSON COUNTY DEFENDANTS*

192.     Defendants Jefferson County, Marshak, Short, John Does 1 and 2, were jail

supervisors acting under the color of law, and were on notice of the obvious need for training and

supervision and the inadequacy of their training and supervision.

193.     The above-named Jefferson County Defendants failed to train, supervise and

discipline their employees to provide adequate medical care to detainees, medication, medical

referral, and responding to medical emergencies..

194.     The above-named Jefferson County defendants were on notice of the obvious

need to train the individual defendant guards and were on notice of the inadequate customs,

practices and failures of their guards to ensure detainees received their prescription medication and

treatment, ensure detainees were concerns were referred to medical, and ensured that medical

referrals and emergencies were responded to.

195.     The final policymakers for Jefferson County include its Sheriff, Defendant

Marshak, and jail administrator Defendants Short, were responsible for training and supervision

of guards in Jefferson County jail.

196.     More specifically, the above named defendants failed to

ensure that subordinates were trained, supervised, and disciplined when necessary to ensure ***a)***

***provided detainees their prescribed medications, b) that their subordinates visited detainees that***

39

*were too sick to walk, bedridden, or otherwise could not leave their cell to walk to see the nurse,*
*including to provide medication to inmates who couldn't walk to the nurse, c) monitored ill*
*detainees or detainees with serious medical needs d) contacted jail or outside physicians related*
*to detainee's serious medical needs, e) properly documented medical events, vital signs as*
*ordered, and medication delivery, f) closely monitored and treated Mr. Zinselmeier's two ADA-*
*recognized disabilities of hypertension and diabetes, g) emergency medical needs were*
*adequately addressed.*

197.    Defendants  Jefferson County, Marshak, and Short John Does 1 and 2 were again on notice of the obvious need for training and/or the failure to train and supervise, and were deliberately indifferent to said need or lack of training and supervision. Defendants Jefferson County, Marshak, and Short failed to discipline the individual defendant guards for their acts and omissions which resulted in Mr. Zinselmeier's lack of care, medicine and death.

198.    Defendants Jefferson County, Marshak, and Short's inadequate training, supervision or discipline was the moving force behind the deprivation of  Mr. Zinselmeier's constitutional rights and injuries to him and Plaintiff.

199.    Defendants Jefferson County, Marshak, and Short, and John Does 1 and 2, failure to train, supervise or discipline jail correctional and medical staff constituted a tacit authorization of the offensive acts.

200.    As a direct and proximate cause of Defendants Jefferson County, Marshak, and Short's failure to train, supervise or discipline staff, Mr. Zinselmeier's suffered a violation of civil rights, pain and suffering to which he and his daughter Plaintiff are entitled to damages under 42 U.S.C. § 1983.

201.    The conduct of the Defendants Jefferson County, Marshak, and Short, was willful,

malicious, oppressive, reckless, and indifferent to the constitutional rights of others and are of such nature that punitive damages should be imposed in the amount commensurate with the wrongful acts alleged herein.

### VITALCORE DEFENDANTS

202.     Defendants VitalCore, Dr. Stanton, Griffon, Johansson, Dayton, and John Does 3-6, acting under the color of law, were aware of Mr. Zinselmeier's serious medical condition and needs.

203.     The above-named Defendants failed to provide adequate medical care to Mr. Zinselmeier.

204.     Defendants VitalCore, Short, Stanton and John Doe 3-6 oversaw policies, procedures, and training of medical staff at the jail.

205.     The final policymakers for VitalCore include its Chief Medical Officer, Regional or State Medical Directors, and corporate executives sued as John Does 3-6 who set binding policies and practices governing medical care in correctional facilities. These officials are responsible for medication formularies, medication and care continuum,  cost-containment protocols, refusal requirements, and emergency escalation procedures.

206.     While the on-site jail physician and nurse practitioner were responsible for day-to-day clinical decisions, they operated under and were constrained by VitalCore's corporate policies and directives.

207.     Upon information and belief, VitalCore maintained a policy and practice of discontinuing more costly medications prescribed by detainee's doctors prior to incarceration,, such as Victoza (liraglutide) injections, and/or limiting or stopping prescription medications from outside physicians.

208.    On or about March 18, 2022, at intake, Mr. Zinselmeier reported that he had been prescribed and was taking Victoza for his diabetes. VitalCore's staff discontinued Victoza.

209.    VitalCore's corporate policymakers were aware of and ratified this discontinuation decision through enforcement of cost-driven formularies, failure to train or supervise staff on continuation of community-prescribed regimens, and failure to correct or reverse the denial of Victoza (liraglutide) in subsequent months, despite knowledge of Mr. Zinselmeier's ongoing diabetic condition and complications.

210.    This ratification and policy/custom were the moving force behind the deprivation of necessary care, the deterioration of Mr. Zinselmeier's health, and his eventual death.

*211.*    VitalCore, Short, Stanton and John Doe 3-6 failed to train and supervise jail medical personnel regarding the continuation or adequate substitution of medications prescribed to incoming detainees by medical providers outside of the jail system.

212.    Upon information and belief, VitalCore staff follow a practice of discontinuing more expensive medications or treatments in favor of less expensive (and not medically equivalent) medications or treatment, solely for the purpose of saving money. By replacing medications and treatments with cheaper, less effective, and non-equivalent  medications and treatments, defendants knowingly and intentionally exposed Mr. Zinselmeier and other detainees to predictable serious health risks.

213.    The above named defendants  failed to discipline the individual defendants guards and nurses for their acts and omissions which resulted in Mr. Zinselmeier's lack of care, lack of medicine and death and were  on notice of the obvious need for training and/or the failure to train and supervise, and were deliberately indifferent to said need or lack of training and supervision.

214.    Upon information and belief, the above named defendants had actual knowledge of

their own failures to train and supervise and the obviousness of the need for such training and supervision. The training provided by VitalCore, Dr. Stanton, and John Doe 3-6 was inadequate to care for the medical needs of detainees, but was nonetheless well known and accepted by staff throughout the jail and their supervisors.

215.    More specifically, the above named defendants failed to

ensure that subordinates were trained, supervised, and disciplined when necessary to ensure *a) provided detainees their prescribed medications, b) that their subordinates visited detainees that were too sick to walk, bedridden, or otherwise could not leave their cell to walk to see the nurse, including to provide medication to inmates who couldn't walk to the nurse, c) monitored ill detainees or detainees with serious medical needs d) contacted jail or outside physicians related to detainee's serious medical needs, e) properly documented medical events, vital signs as ordered, and medication delivery, f) closely monitored and treated Mr. Zinselmeier's two ADA-recognized disabilities of hypertension and diabetes, g) emergency medical needs were adequately addressed.*

216.    Defendants  VitalCore, Dr. Stanton, Griffon, Johansson, and Dayton, and

John Doe 3-6's inadequate training, supervision or discipline was the moving force behind the deprivation of  Mr. Zinselmeier's constitutional rights and injuries to him and Plaintiff and constituted a tacit authorization of the offensive acts.

217.    As a direct and proximate cause of the above named Defendants failure to train, supervise or discipline, Mr. Zinselmeier's suffered a violation of civil rights, pain and suffering to which he and his daughter Plaintiff are entitled to damages under 42 U.S.C. § 1983.

218.    The conduct of the above named defendants was willful,

malicious, oppressive, reckless, and indifferent to the constitutional rights of others and are of such nature that punitive damages should be imposed in the amount commensurate with the wrongful acts alleged herein.

**WHEREFORE**, Plaintiff Kristen Zinselmeier respectfully prays that this Honorable Court enter judgment in her favor and against Defendants Jefferson County, VitalCore, Marshak, Short, Dr. Stanton, and John Doe 1-6; award her compensatory and punitive damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

**COUNT III**
**Unconstitutional Policy Custom, or Practice ("Monell liability") in violation of the**
**Fourteenth Amendment to the U.S. Constitution Cognizable Under 42 U.S.C, § 1983**
***Against Defendant Jefferson County and VitalCore***

219.    Plaintiff hereby incorporates by reference all the allegations made in each preceding paragraphs as if each were set forth herein.

220.    Defendants Jefferson County and VitalCore, Kirchoff, Dayton, Griffon, Johansson, and Does 3-6 were acting under color of state law as agents or employees of VitalCore.

221.    Defendants Jefferson County,VitalCore, Kirchoff, Dayton, Griffon, Johansson, and Does 3-6 deprived Mr. Zinselmeier of his constitutional rights and their actions were pursuant to an expressly adopted official policy or a widespread, longstanding or pervasive policy, practice or custom of Defendants Jefferson County and VitalCore, including but not limited to the policy, custom or practice of *a) not providing detainees their prescription medication, b)not providing detainees adequate medical care, and c) not ensuring that detainees who are too sick or not able to ambulate are provided their prescription medication d) not sending patients presenting with serious medical needs to the hospital or jail infirmary, e) not monitoring detainees with diabetes and high blood pressure, f) not adhering to the jail doctor's orders,*

44

*including standing orders and prescriptions and not adhering to outside physician orders, g) failing to ensure sick inmates are seen by a physician h) delegating professional medical judgment and care to unqualified licensed practical nurses and/or guards, i) failing to closely monitor and treat ADA-recognized disabilities of hypertension and diabetes, j) recording patients as treatment or medication "refusals" when patients didn't refuse medication but were merely too sick or otherwise unable to walk to the medical cart, k) and a policy or custom of inadequate training and supervision to ensure detainees received their prescription medication and constitutionally adequate medical care.*

222.     Additionally, Jefferson County, VitalCore and their agents and employees ignoring their own written policies, procedures and protocols reflects a knowledge of and deliberate indifference to the constitutional rights of detainees, including Zinselmeier, such that inadequate training or supervision actually represents the Jefferson County and VitalCore's "policy". *Szabla v. City of Brooklyn Park, 486 F.3d 385. (8th circuit 2007)*.

223.     Additionally, Defendants Jefferson County and VitalCore, maintained a policy, practice, and/or custom of discontinuing necessary and medically indicated and/or prescribed medications, including Victoza (liraglutide), in order to reduce medication costs and staffing costs related to ordering, storing, and administering such medications. This policy, practice, and/or custom directly resulted in Mr. Zinselmeier being deprived necessary medical care in the form of his weekly liraglutide injections to manage his diabetes and hyperglycemia, which, when taken away from Mr. Zinselmeier, predictably contributed to his declining health and his eventual death, which the autopsy found was caused by hypertensive cardiovascular disease with diabetes mellitus listed as the other significant contributing condition.

224.     Defendants Jefferson County, VitalCore  were on notice of

45

their unconstitutional policies, customs or practices and were deliberately indifferent to them. Defendant Jefferson County and VitalCore's unconstitutional policies, customs and practices were the direct, proximate cause and the moving force causing Mr. Zinselmeier's constitutional injuries.

225.    Furthermore, upon information and belief, Defendants Jefferson County and VitalCore are in the exclusive custody and possession of further information supporting Plaintiff's claim that they had actual knowledge or notice of their unconstitutional policies, customs or practices, including previous failures to provide detainees adequate medical care and prescription medication, and were deliberately indifferent to their policies, customs or practices, as stated above.

226.    Defendant VitalCore has a history of accusations of medical record fraud[7] and other misconduct.[8]

227.    Defendants Jefferson County and VitalCore's deliberate indifference to or failure to address and correct their unconstitutional policies, customs or practices constituted a tacit authorization of said policies, customs and practices.

228.    Upon information and belief, Defendant Sheriff Marshak's and VitalCore were the final policy makers for the Jefferson County jail and VitalCore, respectively, and their failures to discipline their respective subordinates, agents or employees related to Zinselmeier's medical

---

[7] Doctor sues Vermont's former prison health care provider alleging fraud
https://vtdigger.org/2024/10/16/doctor-sues-vermonts-former-prison-health-care-provider-alleging-fraud/
[8] Defender general's investigation finds medical staff failures, 'boy who cried wolf' culture in Springfield prison death case
https://vtdigger.org/2024/01/26/defender-generals-investigation-finds-medical-staff-failures-boy-who-cried-wolf-culture-in-springfield-prison-death-case/

treatment and death, constitute ratification of the Defendant Jefferson County and VitalCore's unconstitutional policies, customs or practices.

229.    The misconduct of the individually-named Defendants and Defendants John and Jane Doe Correctional Guards and Staff, as described herein, deprived the federal rights of Mr. Zinselmeier and *was authorized by and undertaken pursuant to policies, practices or customs that were so pervasive, widespread, well-known, and well-settled, as to constitute a standard operating procedure of Defendants Jefferson County, Jefferson County Sheriff and VitalCore, all acting under the color of state law,* in that it is and was it was the regular pattern, practice and custom for employees to ignore serious medical conditions, to not provide prescribed life-saving medication to their patients.

230.    As a direct and proximate consequence of the acts of of the individually named Defendants, Defendants John and Jane Does, and Defendant Jefferson County and VitalCore, Plaintiff and Mr. Zinselmeier has suffered damages in the form of, inter alia, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth Amendment, cognizable pursuant to 42 U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, mental anguish, loss of life and loss of companionship.

**WHEREFORE**, Plaintiff Kristen Zinselmeier respectfully prays that this Honorable Court enter judgment in her favor and against Defendants Jefferson County and VitalCore; award her compensatory and punitive damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

**COUNT IV**
**Wrongful Death**

47

*Against all Defendants including Jefferson County Missouri, VitalCore Health Strategies, LLC, Sheriff David Marshak, Chelsea Griffon [neé] Helwig], Megan Johansson, Keely Dayton, Roland Kirchoff, Brandon Shoults, Brenda Short, Dr. Danny Stanton, and John Does 1-9*

231.    Plaintiff hereby incorporates by reference all the allegations made in each preceding paragraphs as if each were set forth herein.

232.    At all times relevant, Defendants Jefferson County, Sheriff Marshak, correctional officers (including Defendants Kirchoff and Shoults), jail administrator Short, and medical staff Defendants Dr. Stanton, Griffon, Johansson, and Dayton, and John Doe medical providers, agents or employees of VitalCore Health Strategies, LLC, owed Zinselmeier Zinselmeier a duty to exercise reasonable care for his health and safety while he was detained at the Jefferson County Jail.

**Medical Negligence (VitalCore and Griffon, Johansson, Dayton, and John Does 1-6 Medical Defendants)**

233.    Defendants VitalCore, Dr. Stanton, Griffon, Johansson, Dayton, and John Does 1-6 had a physician-patient and/or nurse-patient relationship with Zinselmeier and owed Mr. Zinselmeier the duty to exercise the degree of skill, learning, and care ordinarily used by reasonably careful healthcare providers under the same or similar circumstances.

234.    Defendants VitalCore, Stanton, Griffon, Johansson, Dayton, and John Doe medical providers        breached        that        duty        of        care        by,        inter        alia:

*a. Failing to monitor or treat dangerously high blood pressure readings documented as early as August 2022, despite actual knowledge that readings exceeded crisis                                                                                        thresholds;*

*b. Failing to take vitals, monitor blood glucose, or otherwise evaluate him when he reported he had not eaten in four days, was vomiting water, and repeatedly stated "I feel*

48

*like I'm gonna die";*

c. *Recording him as a "refusal" when he was too ill to walk to pill call, rather than providing bedside administration of medication as required by Jefferson County Jail Policy J-023 and national correctional standards (NCCHC/ACA);*

d. *Ignoring his January 5, 2023 written sick call request and other requests for medical care and failing to escalate his care to a higher-level provider or outside hospital.*

e. *John Doe Doctors failed to conduct audits required pursuant to RSMo § 334.104.These acts and omissions fell below the standard of care and directly caused Mr. Zinselmeier's hypertensive cardiovascular disease and diabetes to go untreated, leading to cardiopulmonary collapse and death on January 7, 2023.*

f. *Discontinuing Mr. Zinselmeier's prescribed Victoza (liraglutide) injections without medical justification or substitution;*

**Correctional Negligence (Jefferson County, Sheriff Marshak, Kirchoff, Halbach, Shoults, Short, John Does Supervisors 1-2, and John Doe Guards 7-9)**

235.    Defendants Jefferson County, Sheriff Marshak, Kirchoff, Shoults, Short, and John Doe correctional officers owed Mr. Zinselmeier duties recognized under Missouri law and jail policy, including but not limited to:

a. *Duty to summon medical staff or EMS immediately upon observing or being informed of a medical emergency (Policy J-005);*

b. *Duty to ensure access to prescribed medications, including arranging cell-side delivery when an inmate is too ill to walk to the medication cart;*

c. *Duty to perform adequate checks and observation, including responding to inmates who reported Mr. Zinselmeier was unresponsive, vomiting, or had fallen from his bed;*

49

*d. Duty to follow written jail policies and training, including Policies J-005 and J-023 requiring prompt medical evaluation;*

*e. Duty to communicate medical complaints to supervisors and medical staff when Mr. Zinselmeier and other inmates reported that he was "dying";*

*f. Duty not to punish detainees by withholding medication or medical care.*

236.    Defendants Jefferson County, Sheriff Marshak, Kirchoff, Shoults, Short, and John

237.    Doe correctional officers 7-9 breached their duties by, inter alia:

a. Ignoring repeated inmate pleas that Mr. Zinselmeier was fatally ill and needed medical assistance;

b. Telling inmates, "If he wants his meds, he can get up and come get them," despite knowing Mr. Zinselmeier could not get out of bed;

c. Entering Mr. Zinselmeier's cell while he was nonresponsive, but leaving without summoning medical staff or calling EMS;

d. Failing to follow jail policies requiring immediate EMS activation when an inmate is in medical crisis;

e. Treating his inability to retrieve medication as a "refusal" rather than ensuring delivery of medication and continuity of care.

238.    These breaches directly and proximately caused Mr. Zinselmeier's preventable death by depriving him of access to prescribed medications, timely medical evaluation, and emergency treatment.

239.    Defendants doctors, nurses and guards also had ministerial duties to Mr.

50

Zinselmeier including but not limited to following standing orders, physicians orders, and medical and jail policies, supervising inmates in housing units and conducting count and health checks to ensure that inmates are responsive.

240.    Defendants knew their ministerial and nonministerial duties required them to act in adherence to policy to protect Mr. Zinselmeier's health and well being.. Nonetheless, Defendants willfully ignored their duties to follow Jefferson County and VitalCore policies.

241.    Defendants failed to properly adhere to their ministerial duties and when their duties may have been non-ministerial, Defendants acted in bad faith and with malice.

242.    Zinselmeier's autopsy concluded that he died of hypertensive cardiovascular disease with diabetes mellitus listed as a significant condition. These were treatable and manageable illnesses, and his death was foreseeable and preventable had Defendants exercised reasonable care.

243.    As a direct and proximate result of the wrongful acts and omissions of all Defendants, Mr. Zinselmeier died on January 7, 2023.

244.    Plaintiff, as his surviving daughter, has suffered damages including loss of her father's companionship, services, support, guidance, and society; funeral and burial expenses; and profound emotional pain and suffering.

245.    Plaintiff seeks all damages permitted under Mo. Rev. Stat. § 537.090, including pecuniary damages, loss of consortium, funeral expenses, and punitive damages to punish and deter similar conduct.

246.    Defendants acted with malice and/or wantonly doing that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another. Defendants' actions were done needlessly, or manifested a

reckless indifference to the rights of others. Therefore, Plaintiff is entitled to an award of punitive or exemplary damages in an amount sufficient punish defendants and to deter others from like conduct in the future

**WHEREFORE**, Plaintiff respectfully prays for judgment against all Defendants, including *J*efferson County, Missouri; VitalCore Health Strategies, LLC; Sheriff David L. Marshak; Chelsea Griffon [neé] Helwig]; Megan Johansson; Keely Dayton; Roland Kirchoff; Brandon Shoults; Brenda Short; Dr. Danny Stanton; and John Does 1-9, jointly and severally, for compensatory damages, funeral and burial expenses, punitive damages, attorneys' fees, costs, and for such other relief as the Court deems just and proper.

### COUNT V
### Violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12132)
### *Against Jefferson County and VitalCore*

247.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein..

248.   Defendant Jefferson County is a public entity that runs and administers the Jefferson County Jail.

249.   Defendant VitalCore is a public entity in that it is a medical provider to the Jefferson County jail acting under the color of state law.

250.   Decedent Zinselmeier was, at all times relevant, a qualified individual with a disability within the meaning of the Americans with Disabilities Act ("ADA").

251.   Mr. Zinselmeier's hypertension and diabetes, independently, severely impacted his daily life and/or had potential for serious complications like heart disease and death.

252.   Defendants denied decedent Mr. Zinselmeier  the benefits of its services,

programs, and activities, namely access to adequate and necessary medical care, on the basis of Plaintiff's disabilities, including failing to closely monitor and treat hypertension and diabetes.

253.    The Defendants' failure to accommodate Mr. Zinselmeier's hypertension disability and diabetes disabilities was intentional or showed deliberate indifference to Mr. Zinselmeier's disabilities.

254.    By refusing to provide medically necessary close monitoring and treatment for Plaintiff's father's disabilities (diabetes and hypertension), Defendants violated the ADA and were the proximate cause of Mr. Zinselmeiers' pain, suffering and death.

255.    Zinselmeier's diabetes left him unable to regulate his blood sugar without medication, and his hypertension left him at constant risk of cardiovascular collapse. These conditions substantially impaired his daily functioning and ultimately rendered him unable to care for himself, walk to retrieve medication, or even speak before his death.

256.    The Defendants' failure to reasonably accommodate Mr. Zinselmeier's hypertension and diabetes disabilities, during the period of his detention, even knowing he couldn't walk or was unresponsive, was intentional or showed deliberate indifference to Mr. Zinselmeier's disabilities.

257.    The Defendants' denied Mr. Zinselmeier of necessary and reasonable accommodations, namely, a way to receive his medication when he was unable to leave his cell or walk to the medication cart at the pod door. Detainees who were able to walk to the medication cart were provided with their prescription medication, but Mr. Zinselmeier, because of his disabilities, did not and no accommodation was made to ensure he took his prescription medication.

258.    Failing to provide Mr. Zinselmeier with his medication in his cell or otherwise

ensuring delivery constituted a denial of legally required accommodations for his disabilities.

259.    Plaintiff and her father, Mr. Zinselmeier, suffered damages, including pain, suffering and death, as a direct result of this unlawful conduct.

**WHEREFORE,** Plaintiff Kristen Zinselmeier respectfully prays that this Honorable Court enter judgment in her favor and against Defendants Jefferson County and VitalCore; award her compensatory and punitive damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

**COUNT VI**
**Violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794)**
*Against Jefferson County and VitalCore*

260.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

261.    Defendant Jefferson County is a public entity that runs and administers the Jefferson County Jail.

262.    Defendant VitalCore is considered a public entity for purposes of the Act in that it is a medical provider to the Jefferson County jail acting under the color of state law.

263.    Defendant Jefferson County has received or receives federal financial assistance.

264.    Upon information and belief, Defendant VitalCore does or did receive federal financial assistance, including but not limited to Medicare and Medicaid payments and COVID relief funds.

265.    All individual defendants were, at all times relevant, employees or agents of Jefferson County or VitalCore.

266.    By refusing to provide medically necessary close monitoring and treatment for Plaintiff's father's disabilities (diabetes and hypertension), Defendants violated Section 504 of the Rehabilitation Act and were the proximate cause of Mr. Zinselmeier's pain, suffering and death.

54

267.    Mr. Zinselmeier's hypertension and diabetes severely impacted his daily life or had potential for serious complications like heart disease.

268.    Mr. Zinselmeier's hypertension and diabetes substantially limited major life activities, including eating, drinking, walking, breathing, circulatory function, and endocrine function.

269.    Zinselmeier's diabetes left him unable to regulate his blood sugar without medication, and his hypertension left him at constant risk of cardiovascular collapse. These conditions substantially impaired his daily functioning and ultimately rendered him unable to care for himself, walk to retrieve medication, or even speak before his death.

270.    The Defendants' failure to accommodate Mr. Zinselmeier's hypertension and diabetes disabilities, during the period of his detention, even knowing he couldn't walk or was unresponsive, was intentional or showed deliberate indifference to Mr. Zinselmeier's disabilities.

271.    Plaintiff and her father, Mr. Zinselmeier, suffered damages, including pain, suffering and death, as a direct result of this unlawful conduct.

**WHEREFORE,** Plaintiff Kristen Zinselmeier respectfully prays that this Honorable Court enter judgment in her favor and against Defendants Jefferson County and VitalCore; award her compensatory and punitive damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

272.    Plaintiff hereby demands trial by jury on all of the above issues, costs herein incurred, fees where appropriate, and such relief as is deemed appropriate for the Court.


Dated: December 31, 2025

Respectfully submitted,

**PEDROLI LAW, LLC**

Mark J. Pedroli, MBE 50787
**PEDROLI LAW, LLC**
7777 Bonhomme Ave, Suite 2100
Clayton, Missouri 63105
314.669.1817
314-789.7400 Fax
Mark@PedroliLaw.com

56